UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ASHLEY IACOBUCCI,

            Plaintiff,

**Hon. Hugh B. Scott**

v.

**17CV404**

**CONSENT**

NANCY A. BERRYHILL[1], Acting
Commissioner of Social Security,

            Defendant.

**ORDER**

Before the Court are the parties' respective motions for judgment on the pleadings

(Docket Nos. 9 (plaintiff), 10 (defendant Commissioner)).   The parties consented to proceed

before the undersigned as Magistrate Judge (Docket No. 12, Order of June 7, 2018).

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the Commissioner of Social Security that plaintiff is not disabled and, therefore, is not entitled

to disability insurance benefits and/or Supplemental Security Income benefits.

## PROCEDURAL BACKGROUND

The plaintiff ("Ashley Iacobucci" or "plaintiff") filed an application for disability

insurance benefits on March 21, 2011.   That application was denied initially.   The plaintiff

---

[1]Nancy A. Berryhill was the Acting Commissioner of Social Security at the commencement of this action, but no successor has been named, see Joe Davidson, "Social Security Is now Headless because of Trump's Inaction," Wash. Post, Mar. 12, 2018.   Pursuant to Federal Rule of Civil Procedure 25(d)(1), Ms. Berryhill substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this action; no further action is required, 42 U.S.C. § 405(g).   President Donald Trump nominated Andrew M. Saul as Commissioner of Social Security on April 17, 2018, see 86 U.S.L.W. 1487 (Apr. 19, 2018).

appeared before an Administrative Law Judge ("ALJ"), who considered the case de novo and concluded, in a written decision dated November 26, 2012, that the plaintiff was not disabled within the meaning of the Social Security Act. That decision became the final decision of the Commission on March 28, 2014, when the Appeals Council denied plaintiff's request for review. Plaintiff sought judicial review, Iacobucci v. Colvin, No. 14CV394S, and the matter was remanded upon stipulation on December 4, 2014 (R. 356). The Appeals Council then remanded to the ALJ for further proceedings (R. 358) to reconsider the mental medical source evidence and opinions, make a determination regarding whether plaintiff met or equaled the severity criteria for Listing 12.05 and document the basis for the determination (R. 361). The ALJ was also to evaluate plaintiff's subjective complaints, give further consideration to plaintiff's maximum residual functional capacity, if warranted obtain medical expert testimony to clarify the severity of plaintiff's impairments, and, if necessary, obtain testimony from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base (R. 362).

Upon this remand, the ALJ held a second hearing on August 19, 2015, and rendered his decision denying disability (R. 367). On November 18, 2015, plaintiff submitted a letter noting her exceptions (Docket No. 1, Compl. at 2, ¶ 16). The Appeals Council, however, did not deem this a valid request for review (id. at 3, ¶ 19), later holding that a subsequent letter seeking review was time barred and stating that no further action would be taken on her case (id. ¶ 22). Plaintiff argues that the November 18, 2015, letter should serve as her formal exceptions (id. ¶ 23). The ALJ's decision became the final decision of the Commissioner on March 7, 2017 (R. 291), when the Appeals Council denied plaintiff's request for review. Defendant does not object to judicial review based on plaintiff's letter.

Plaintiff commenced this action on May 11, 2017 (Docket No. 1). The parties moved for judgment on the pleadings (Docket Nos. 9, 10). The motions were deemed submitted on January 2, 2018 (Docket No. 8), following plaintiff's timely reply (Docket No. 11).

## FACTUAL BACKGROUND[2]

Plaintiff was born on September 4, 1981, and has a high school education (R. 25, 376). When in school, plaintiff was diagnosed as learning disabled and had a full-scale IQ score of 70 in 2004 (R. 178; Docket No. 9, Pl. Memo. at 15) and in 2007 was found to have characteristics of a learning-disabled student throughout her career (R. 204; Docket No. 9, Pl. Memo. at 15). Plaintiff had no past relevant work (R. 25, 19, 369, 376), but worked part-time during the relevant period (as discussed below). Plaintiff was deemed a younger individual (age 18-49) (R. 25, 376).

From her onset date, plaintiff lived with her mother, twin sister, and plaintiff's infant daughter (R. 228; Docket No. 9, Pl. Memo. at 3). By 2013, she was living with her boyfriend and her daughter (R. 521), noting that she was more stressed living with her mother (R. 521).

Plaintiff's impairments are borderline intellectual functioning; learning disability; depressive disorder; anxiety disorder (R. 19); and obesity (R. 369). Plaintiff stood 62 inches and weighed 201 pounds in July 2011 (R. 374, 256), and 61 inches and weighed 217 pounds, with a body mass index of 41, during an examination on June 2013 (R. 369-70, 551, 554). Plaintiff claimed back pain but the ALJ found that it was not a severe impairment (R. 370).

---

[2]References noted as "(R.___)" are to the certified record of the administrative proceedings, filed with this Court as Docket No. 6.

## MEDICAL AND VOCATIONAL EVIDENCE

The ALJ considered plaintiff's mental condition under Listing 12.05, 12.04, and 12.06. Applying the "paragraph B" criteria and Listing 12.05 "paragraph D" criteria, the ALJ found plaintiff had mild restriction for activities of daily living; mild to moderate difficulties for social functioning; moderate difficulties for concentration, persistence, or pace; and no episodes of decompensation (R. 370-71).   The ALJ found that Listing 12.04 "paragraph B" or Listing 12.05 "paragraph D" criteria were not met (R. 371, 372).   The ALJ then found Listing 12.05 "paragraph A" was not met because the ALJ found plaintiff could take care of her personal needs (R. 372).   The ALJ also concluded that "paragraph C" of Listings 12.04 and 12.06 were not met (R. 371) as were the criteria for "paragraph B" of Listing 12.05 since plaintiff's IQ was not 59 or less (R. 372).   Although plaintiff has sub-average intellectual functioning, she does not have the deficits in adaptive functioning, since plaintiff stated that she could perform her own personal needs, follow directions, and can take standardized measures of intellectual functioning testing (R. 372).   She can interact socially with her parents and has friends (R. 372).   She testified that she could clean, shop, and take care of her daughter (R. 372).   The ALJ concluded that plaintiff did not have the requisite deficits in adaptive functioning necessary to satisfy Listing 12.05 (R. 372), applying the definition for adaptive functioning under DSM-IV, that is "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting" (R. 372), see American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 42 (4th Text Rev. Ed. 2000) ("DSM-IV").

*Treatment by Dr. Wendy Weinstein*

Dr. Wendy Weinstein, plaintiff's treating psychiatrist, initially evaluated plaintiff on

July 15, 2011 (R. 258, 273; <u>see</u> Docket No. 9, Pl. Memo. at 5-7). Dr. Weinstein noted that

plaintiff had symptoms of depression and anxiety (R. 258, 273). Plaintiff described her anxiety

as getting very nervous and shaking, and her depression as feeling sleepy, not wanting to be

around anyone, and crying a lot (R. 258, 273; <u>see</u> Docket No. 9, Pl. Memo. at 5-6). Her mood

was "real down" and she had been going through this for eight years (R. 258, 273),

Dr. Weinstein diagnosed her mood as depressed, with major depression, recurrent (R. 258, 273;

Docket No. 9, Pl. Memo. at 6). Here energy was poor, her concentration was not so good, and it

was hard for her to make decisions (R. 258, 273). Plaintiff stated that her depression leads her

to an inability to focus and she could not work or go to school because of her depression (she not

being able to get out of bed) (R. 258, 273). Plaintiff admitted to symptoms of panic, getting

very nervous, frequent crying, occasional heart racing and feeling the room is spinning (R. 258,

273; Docket No. 9, Pl. Memo. at 6). For plaintiff's obsessive-compulsive disorder ("OCD"),

she requires everything to be very neat and clean and if not, she screams and throw things

(R. 258, 273; Docket No. 9, Pl. Memo. at 6). Dr. Weinstein concludes that plaintiff "is suffering

from prominent symptoms of depression which appear to be affecting her functioning, her

concentration, her energy, her focus and her motivation making it difficult for her to work and go

to school" (R. 260, 275; Docket No. 9, Pl. Memo. at 6-7). Dr. Weinstein changed plaintiff's

prescription to Cymbalta (R. 260).

Dr. Weinstein treated plaintiff from July 2011 to July 2015 (<u>see</u> Docket No. 9, Pl. Memo.

at 5-7, 7-13), assessing plaintiff with major depression, recurrent, only later adding a diagnosis

for OCD (R. 522, Oct. 7, 2013).    On August 25, 2011, plaintiff saw Dr. Weinstein and reported that she stopped taking Cymbalta because she felt shaky and nervous on it (R. 266).    She reported her mood was so-so and that she sometimes slept all day (R. 266).    Plaintiff had panic attacks when she felt something big was about to occur (R. 266).    Dr. Weinstein started plaintiff on Viibryd (R. 266).    Plaintiff then reported feeling good on Viibryd and in October 2011 reported that she was starting college classes (R. 265, 374).    On November 22, 2011, plaintiff reported that she started school at ECC but still had anxiety and felt paranoid at night (R. 264).    Dr. Weinstein assessed plaintiff with major depression, recurrent (R. 264).    On December 22, 2011, plaintiff said she felt less paranoid and was doing well on Abilify (R. 263).    She said she passed her fall classes but she believed she could not work because of depression (R. 263, 374; Docket No. 9, Pl. Memo. at 8).

On January 26, 2012, plaintiff saw Dr. Weinstein and stated she had quit school because it was too much (R. 262; Docket No. 9, Pl. Memo. at 9).    In February and April 2012, plaintiff stated that she felt shaky in sustained work and some days she feels that she cannot get out of bed for work (R. 277, 278; Docket No. 9, Pl. Memo. at 9).    In May 2012, plaintiff complained that she had broken down, was very depressed, laid in bed all day, and had trouble doing things (R. 279; Docket No. 9, Pl. Memo. at 9-10).    She thought living alone (with her young child) would be too much for her and she lived with her two-year-old daughter and her mother helping with childcare (R. 279; Docket No. 9, Pl. Memo. at 10).    Dr. Weinstein prescribed increased dosage of Prozac (R. 279; Docket No. 9, Pl. Memo. at 10).    On July 5, 2012, plaintiff reported having more panic attacks and shaking (R. 280; Docket No. 9, Pl. Memo. at 10).    She said she would get scared and have panic attacks a couple times a day (R. 280; Docket No. 9, Pl. Memo.

at 10).   She contended that she could not be in small rooms, an elevator, or a car wash (R. 280).

On August 7, 2012, plaintiff said she was more depressed (R. 281, 531).   Dr. Weinstein noted

that her symptoms were situational and her medication would not be adjusted until she started

therapy (R. 281, 531; Docket No. 9, Pl. Memo. at 10).   Plaintiff agreed to begin therapy (R. 281,

531).

On October 2, 2012, after seeing a therapist, plaintiff complained of panic attacks and

anxiety attacks daily (R. 530).   Plaintiff was at K-Mart once but had to leave due to all the

people there (R. 530).   She said she could not move out to live on her own because she could

not manage the house or shop for groceries (R. 530).   Dr. Weinstein increased plaintiff's Prozac

and started Klonopin (R. 530; Docket No. 9, Pl. Memo. at 10).   On October 31, 2012, plaintiff

presented stressed, with her OCD being particularly bad (R. 529; Docket No. 9, Pl. Memo. at

10).   On her next appointment, on November 28, 2012, plaintiff stated that she suffered from

anxiety attacks (R. 528).   When suggested that she work as a cleaner, plaintiff said that she

could not leave her house due to her condition and her OCD was getting worse (R. 528).

Dr. Weinstein prescribed continued therapy and did not change her medication (R. 528).

In January 2013, plaintiff complained of agitation and that she had to avoid being around

people (R. 527).   She was depressed, crying, and laying in her bed (R. 527).   Her OCD was bad

when plaintiff felt good (R. 527).   Her concentration was low and her sleep is impaired because

she woke up frequently in the night (R. 527).   Plaintiff was very stressed on her February 19,

2013, appointment since she had an automobile accident (R. 526).   She was sleeping less, up all

hours but not napping (R. 526).   She was to schedule an appointment with an OCD specialist at

Buffalo General Hospital (R. 526).   On April 4, 2013, plaintiff reported that she stopped taking

Prozac and Abilify and was just taking Klonopin and was "fine" (R. 525). Her concentration was all right, but sometimes it was difficult and she was distracted. Her sleep was alright, with plaintiff taking Klonopin before going to bed (R. 525). Dr. Weinstein prescribed Paxil (R. 525). On May 16, 2013, plaintiff reported that she was doing okay, she was taking Paxil and her mood is significant for "getting my day" (R. 524). Some days were good, some were not, and plaintiff believed she could never plan (R. 524). Her sleep was less at night, "off and on" (R. 524).

On July 16, 2013, plaintiff stated that she was doing okay, but complained of back problems and was on pain medication (R. 523). Her OCD subsided a bit due to her back pain (R. 523). Dr. Weinstein increased the dosage for her Paxil and renewed her Klonopin (R. 523). On October 7, 2013, plaintiff reported that she worked part time cleaning at New Era Cap (cf. R. 522, 521; Docket No. 9, Pl. Memo. at 11). Her mood was good but variable, sometimes good, sometimes not. Her energy, concentration, and sleep were good. (R. 522.) Plaintiff also reported moving out on her own, living with her boyfriend and her daughter (R. 522). Klonopin was helping with plaintiff's depression and anxiety (Docket No. 9, Pl. Memo. at 11; R. 522). For the first time, Dr. Weinstein diagnosed plaintiff as having OCD as well as major depression, recurrent (R. 522). On November 23, 2013, plaintiff was still cleaning part time and her mood depended upon how she woke up (Docket No. 9, Pl. Memo. at 12; R. 521). Plaintiff was less stressed not living with her mother (R. 521; Docket No. 9, Pl. Memo. at 12). Plaintiff made a similar report on November 25, 2013, that she was doing pretty good but her mood depended upon how she wore up and her complaints were due to her back pain (R. 521).

On February 18, 2014, plaintiff continued to work part time at New Era but she was tired and doing a lot (working, caring for herself and her daughter) (R. 520). Sometimes her sleep

varied, with plaintiff occasionally sleeping all day (R. 520). She continued her medication (Paxil and Klonopin) (R. 520). On May 19, 2014, plaintiff reported that she still worked part time and she was doing okay although her back problems persist (R. 518). Plaintiff's grandmother passed away a month before and plaintiff thinks of her and was still in a bit of shock (R. 518). Plaintiff's energy was okay but she got sleepy at times (R. 518). Plaintiff said her OCD symptoms were diminishing a little bit, leading her to stop taking Paxil (R. 518). After taking herself off Paxil, plaintiff agreed to resume at lower dosage (R. 518). On her July 14, 2014, appointment, plaintiff reported that she was doing alright, but sometimes she felt lazy and tried to get motivated (R. 517). Dr. Weinstein found plaintiff's energy was significant for being tired, but her concentration was okay and she slept better and had diminished OCD symptoms (R. 517). Plaintiff took Aleve for her chronic back pain (R. 517).

Plaintiff reported on September 24, 2014, that she stopped working her part time job because her "anxiety was too high and I was a little depressed" (R. 516). She was in a lot of back pain and was taking muscle relaxants for it (R. 516). Her mood was depressed and she slept during the day (R. 516). She was depressed, in part, due to her grandmother's death (see R. 516). Dr. Weinstein increased her dosage of Paxil (R. 516). On November 18, 2014, plaintiff reported having "her days" and was more tired and sleepy. She took the increased dosage of Paxil. She had anxiety when around people and her energy was down. (R. 515.)

On January 27, 2015, plaintiff reported that she was doing all right and that she was working "a little less than part time at her daughter's school" (R. 514). Plaintiff said it was hard to motivate herself after work because she was tired and she gets stressed from working with another child that requires extra attention (R. 514). On April 23, 2015, plaintiff stated that she

was doing alright but could not work anymore because her anxiety was getting to her, with plaintiff not able to get out of bed some days (R. 564). Dr. Weinstein increased her dosage of Paxil (R. 564). On July 10, 2015, plaintiff reported that she was about the same (R 565). She was undergoing physical therapy for her back but the pain was such that she is crying and had to take naproxen and muscle relaxant (R. 565). Her sleep was okay save for the back pain and her OCD was the same, claiming that she cannot work due to her pain and OCD (R. 565). Dr. Weinstein continued plaintiff's medication and scheduled her appointment in two and a half months (R. 565).

During Dr. Weinstein's treatment of plaintiff, she had plaintiff return for appointments at six- to eight-week intervals (or longer) (R. 516-28, 564-65), after initially visiting Dr. Weinstein almost monthly (R. 266, 265, 264, 263, 262, 277, 278).

*Assessments of Plaintiff*

For the mental health assessment, on June 21, 2011, state agency examiner Dr. Hillary Tzetzo evaluated plaintiff and found that she had mild difficulties in maintaining social functioning (R. 232, 242, 371). Dr. Tzetzo adopted Dr. Renee Baskin's findings that plaintiff had minimal to no limitations in her ability to follow and understand simple directions and perform simple tasks independently (R. 244, 229-30, 371). Dr. Tzetzo also found that plaintiff was moderately limited in her ability to understand and remember detailed instructions, she had moderate restrictions in her ability to interact appropriately with the general public (R. 246, 247, 376), but not limited in her ability to interact with supervisors and co-workers (R. 247, 376).

The ALJ found that plaintiff suffered from symptoms of depression and anxiety causing mild to moderate limitations in social functioning and moderate limitations in concentration,

persistence, or pace (R. 373).   The ALJ concluded, however, that Plaintiff's mental impairments did not preclude her from satisfying basic mental demands of unskilled work (R. 373), with her examinations supporting this conclusion (R. 373).   For example, Dr. Baskin evaluated plaintiff on May 9, 2011, found that plaintiff's manner of relating, social skills, and overall presentation were adequate, but her attention and concentration were only slightly impaired (R. 231, 229, 373).   Dr. Baskin did note that plaintiff had anxiety-related symptomology for excessive apprehension and worry, shaking and panic attacks, which occur when plaintiff is around people (R. 231).   Dr. Baskin concluded that plaintiff could perform simple tasks independently, maintain attention and concentration, she had moderate limitations being able to make appropriate decisions, relate adequately with others and appropriately deal with stress (R. 229-30).   The ALJ noted plaintiff's daily activities, of working part time and attending college classes, support the ALJ's finding of no deficits in adaptive functioning (R. 373).

The ALJ also found that plaintiff's claims as to the intensity, persistence, or limiting effects of symptoms are not entirely credible, with "limited substantive support" (R. 375).   The ALJ noted that when plaintiff took her medication, her mental condition was controlled (R. 375). The ALJ also found that plaintiff's OCD symptoms do not adversely affect her functioning (R. 375).   Dr. Weinstein noted that plaintiff's stressors were situational in nature (R. 281, 374, 375).   The ALJ gave significant weight to the opinion of consulting psychiatrist Dr. Tzetzo, that plaintiff had moderate restriction in her ability to interact with others (R. 247, 376). Dr. Tzetzo's opinion was supported by Dr. Baskin's evaluation (R. 230) who found that plaintiff had minimal to no limitations in her ability to follow and understand simple directions and to perform simple tasks (R. 229-30).   Dr. Baskin also noted that plaintiff's ability "appears to be

compromised by a lack of involvement in any type of consistent counseling, lack of motivation, lack of energy and immaturity" (R. 230).

In 2013, plaintiff was working 15 hours per week cleaning offices part time (R. 521, 375). Plaintiff later worked 20 hours per week, living with her daughter and taking college courses (R. 143, 264, 305-06, 314-16, 322-23, 370-76 (ALJ), 520-22; Docket No. 10, Def. Memo. at 13). Plaintiff testified that she took non-credit courses at college (R. 323) until her learning disability prevented her finishing (R. 305; see R. 264).

*Plaintiff's Residual Functional Capacity and Determination of Disability*

The ALJ found that plaintiff had a residual functional capacity to perform light work except plaintiff can understand, remember, and carry out complex and detailed tasks; she can only occasionally interact with the public, and can frequently interact with co-workers and supervisors (R. 373). He concludes that this residual functional capacity assessment is supported by the opinions of Drs. Tzetzo and Baskin (R. 376); the ALJ does not comment on the weight given to treating psychiatrist, Dr. Weinstein.

The ALJ presented to the vocational expert a hypothetical claimant with plaintiff's age, education, work experience, and residual functional capacity. The expert opined that such a claimant could work as an assembler (light exertion work) or a warehouse support worker (also light exertion work). (R. 377.) As a result, the ALJ concluded that plaintiff was not disabled (R. 377, 378).

**DISCUSSION**

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence.   See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).   Substantial evidence is defined as "'more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

*Standard*

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that the impairment prevents the claimant from returning to his or her previous type of employment.   Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).   Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the

13

national economy and which the plaintiff could perform." Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing past relevant work; and

(5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). However, it should be noted that the ALJ has an affirmative duty to fully develop the record. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work that has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." See Social Security Ruling 82-62 (1982);

Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994). The ALJ must then determine the individual's ability to return to past relevant work given the claimant's residual functional capacity. Washington, supra, 37 F.3d at 1442.

*Application*

In the instant case, plaintiff argues that the ALJ improperly concluded that she did not meet Listing 12.05C (Docket No. 9, Pl. Memo. at 17-20). She faults the ALJ for using the obsolete DSM-IV rather than the current DSM-5 for defining adaptive functioning (id. at 17, 18-19). She argues that she had deficits in adaptive functioning not recognized by the ALJ (id. at 17-20). Plaintiff then faults the ALJ's residual functional capacity because it did not properly account for the medical opinion evidence (id. at 20-22), namely not incorporating the opinion of Dr. Renee Baskin into the assessment (id. at 20; R. 374, 376; see Docket No. 11, Pl. Reply Memo. at 3-4). She argues that Dr. Baskin's opinion about her abilities to deal with stress and make decisions contradicts the ALJ's findings (Docket No. 9, Pl. Memo. at 20). Plaintiff faults the ALJ for not taking into account her anxiety, OCD, and depression, thus "play[ing] doctor" in rendering his medical opinion on plaintiff's limitations were less than they actually were (id. at 21-22).

Defendant counters that substantial evidence supports the ALJ finding that plaintiff was not disabled (Docket No. 10, Def. Memo. at 11-15). Defendant argues that plaintiff did not have adaptive functioning deficits required for Listing 12.05C (id. at 13), failing to meet her burden of proof on this point (id. at 11-12). Defendant did not reach the other criteria claimed by plaintiff under Listing 12.05C (id. at 12 n.5). Defendant also claims that the ALJ properly evaluated the opinion evidence and thus correctly formulated plaintiff's residual functional

15

capacity (id. at 16-18).   Defendant contends plaintiff's understanding of Dr. Baskin's opinion is incomplete (id. at 16), disregarding so much of the opinion that assessed minimal to no limitations (R. 229-30; Docket No. 10, Def. Memo. at 17).

I.      Listing 12.05 Requirements

Intellectual disability under Listing 12.05C "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning with defects in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (Docket No. 9, Pl. Memo. at 18; see also Docket No. 10, Def. Memo. at 12).   Listing 12.05C also verbal, performance, or full scale IQ of 60-70 (present here, R. 198; Docket No. 9, Pl. Memo. at 19); and physical or other mental impairment imposing additional significant work-related limitation of function (Docket No. 9, Pl. Memo. at 19; Docket No. 11, Pl. Reply Memo. at 1).

As for general intellectual functioning, plaintiff points out that she was identified as learning disabled in the second grade (R. 199; Docket No. 9, Pl. Memo. at 18), she had significant deficits in attention, concentration, and sequencing (R. 199-200), and had most difficulty with short-term memory (R. 200; Docket No. 9, Pl. Memo. at 18).   The ALJ conceded that plaintiff had subaverage intellectual functioning (R. 372; Docket No. 9, Pl. Memo. at 18).

A.      DSM Versions

The ALJ found that plaintiff did not have sufficient deficits in adaptive functioning under Listing 12.05C (R. 372; Docket No. 9, Pl. Memo. at 18).   Plaintiff argues that the ALJ reached this conclusion by applying the DSM-IV definition for adaptive functioning rather than the current DSM-5 definition (Docket No. 9, Pl. Memo. at 18-19).   Plaintiff alternatively argues

that, applying DSM-IV standards, the ALJ erred in not recognizing plaintiff's adaptive functioning deficits in her inability to cope with common life demands (as indicated in the treatment notes of Dr. Weinstein) (id. at 19-20). Plaintiff argues that her OCD, panic attacks, and depression left her bed ridden, anxious, and unable to work consistently (see id. at 19).

Plaintiff first contends that the ALJ applied the "obsolete" DSM-IV definition of adaptive functioning (Docket No. 9, Pl. Memo. at 17). Defendant responds that plaintiff fails to cite any authority that criticizes the ALJ for citing the older DSM-IV rather than the more current version DSM-5 (Docket No. 10, Def. Memo. at 15). Plaintiff fails to cite the standard under DSM-5[3] or note any differences between the two versions of the Diagnostic and Statistical Manual (cf. id. at 15 & n.7). From plaintiff's onset date of March 1, 2011, her symptoms were identified under DSM-IV. The American Psychiatric Association later published the Diagnostic and Statistical Manual of Mental Disorders, fifth edition in 2013 (or "DSM-5"). Therefore, both standards described her symptoms while plaintiff's application was pending. See also Watkins v. Berryhill, No. 7:16-CV-242-FL, 2017 WL 3574450, at *4 n.7 (E.D.N.C. Aug. 1, 2017), noting amendment to Listing 12.05 that tracked changes from DSM-IV to DSM-5 was effective as of January 17, 2017, thus the prior version in effect at the time of the ALJ's decision was considered (citing to DSM-IV-TR); Hightower v. Commissioner, No. C/A No. 1:14-2761-RBH-SVH, 2015 WL 5008668, at *17 (D.S.C. June 12, 2015) (court had not adopted a rule requiring that deficits in adaptive functioning be defined by the latest version of the DSM). In drafting the definitions in Listing 12.05, the Social Security Administration used three other professional organizations as well as the American Psychiatric Association and the DSM to not "seek to

---

[3]American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 31, 33 (5th ed. 2013) ("DSM-5").

endorse the methodology of one professional organization over another," <u>Technical Revisions to Medical Criteria for Determinations of Disability</u>, 67 Fed. Reg. 20018-01, 2002 WL 661740, at 20022 (Soc. Sec. Admin. Apr. 24, 2002); <u>Ragin v. Colvin</u>, No. 5:14-CV-851-D, 2016 WL 2600508, at *4 n.4 (E.D.N.C. Apr. 14, 2016). Thus, changes in the DSM may not require retroactive application of those changes to diagnoses.

Below is a side-by-side comparison of the definitions for adaptive functioning in both versions of the DSM:

| DSM-IV | DSM-5 |
|---|---|
| "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting," DSM-IV, at 42. | "Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community," DSM-5, at 33 |

Plaintiff fails to show significant difference between the two standards or how the ALJ misapplied the DSM-5 standard to her circumstances. She does not cite any legal authority that would compel the ALJ to use the most recent version of the DSM in evaluating her condition. The ALJ thus did not err in applying the earlier DSM-IV standards despite later enactment of DSM-5.

B.    Plaintiff's Adaptive Functioning

Applying the DSM-IV standard (which would apply for much of the time claimed by plaintiff) and adaptive functioning, plaintiff worked for up to twenty hours a week, living with her daughter, and briefly took college courses. Plaintiff does not have deficits comparable with

Listing 12.05C.   Plaintiff has the burden to prove that she met the Listing level (Docket No. 10,

Def. Memo. at 11-12).   Plaintiff's adaptive functioning exceeds the level of <u>Talavera v. Astrue</u>,

697 F.3d 145, 153 (2d Cir. 2012), plaintiff's contrary argument (<u>cf.</u> Docket No. 11, Pl. Reply

Memo. at 2) notwithstanding.

This Court considered (as discussed in some detail above) Dr. Weinstein's treatment

notes from 2012-15 for plaintiff.   It is notable that plaintiff's condition improved after she

changed antidepressants, then moved away from her mother and lived on her own (<u>see</u> Docket

No. 9, Pl. Memo. at 12; R. 521).   Plaintiff also improved with therapy.   If her condition had

worsened during this period as plaintiff contends, Dr. Weinstein would have seen her more

frequently than every six to eight weeks as was occurring from November 2012 to July 2015.

Although plaintiff argues that her OCD prevented her from leaving home (Docket No. 9, Pl.

Memo. at 19), Dr. Weinstein's medical record showed that plaintiff did leave home, including

part time work at New Era and her daughter's school.   Plaintiff's OCD diminished with

medication (R. 517-18) and being too tired to clean after working at her daughter's school

(R. 514).   Although the ALJ does not comment on the weight given to Dr. Weinstein's opinions,

the doctor's views are consistent with the assessment that (with medication and therapy) plaintiff

could perform work.   Plaintiff's motion for judgment (Docket No. 9) on this ground is **denied**.

II.      Residual Functional Capacity

Plaintiff next argues that the ALJ misstates her residual functional capacity (Docket

No. 9, Pl. Memo. at 20).   She claims that this assessment did not account for moderate

limitations found by Dr. Baskin in plaintiff's ability to deal with stress and in decision making,

that plaintiff can perform simple tasks independently (R. 230; Docket No. 9, Pl. Memo. at 20).

Dr. Baskin, however, found that regarding vocational functional capacities, plaintiff "would have minimal to no limitations being able to follow and understand simple directions and instructions, preform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks with supervision," while having moderate limitations "being able to make appropriate decisions, relate adequately with others and appropriately deal with stress" (R. 229-30). Dr. Baskin found this evaluation to be consistent with plaintiff's psychiatric problems (R. 230) while noting that plaintiff "also appears to be compromised by lack of involvement with any type of consistent counseling, lack of motivation, lack of energy and immaturity" (R. 230). Dr. Baskin recommended that plaintiff consider "some type of vocational training/rehabilitation given her youth" (R. 230). The ALJ's assessment of plaintiff's residual functional capacity is consistent with Dr. Baskin's findings and **is complete**.

Plaintiff also argues that since the residual functional capacity assessment is incomplete then the hypothetical to the vocational expert is incomplete (Docket No. 9, Pl. Memo. at 21-22). Given the finding here that this assessment was complete, the hypothetical based upon plaintiff's residual functional capacity and the vocational expert's opinion based thereon is **not flawed**. Plaintiff's objections on these grounds are baseless and **are rejected** and her motion for judgment (Docket No. 9) on this ground also is **denied**.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner **IS AFFIRMED**. Defendant's motion for judgment on the pleadings (Docket No. 10) **IS GRANTED** and plaintiff's motion for similar relief in her favor (Docket No. 9) **IS DENIED**. The Clerk of this Court shall close this case.

So Ordered.

_s/Hugh B. Scott_
Hon. Hugh B. Scott
United States Magistrate Judge

Buffalo, New York
June 7, 2018